

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DGR
F. #2017R02213

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 20, 2020

By ECF

The Honorable Margo K. Brodie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Joseph Johnson
      Criminal Docket No. 18-279 (MKB)

Dear Judge Brodie:

   The government respectfully submits this letter in advance of the defendant Joseph Johnson's sentencing, which is currently scheduled for January 24, 2020 at 10:30 a.m. In his sentencing submission, the defendant requests a variance from the applicable U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range of 121 to 151 months, which range, given the statutory maximum, is already restricted to 60 months. (Def. Ltr. 4, ECF No. 111.) For the reasons set forth below, the government respectfully submits that given the seriousness of the offense, the defendant's history and characteristics, and the substantial benefit already conferred by the statutory maximum, no variance is warranted from the applicable Guidelines range and the Court should sentence the defendant to 60 months.

I. Background

   For more than a year, the defendant, a convicted felon, led an interstate gun trafficking conspiracy responsible for the illegal purchase, sale and transport of more than 35 firearms guns between Virginia and New York. (PSR ¶¶ 3-4.) As set forth below, the defendant was the leader of this conspiracy and managed every aspect of it. As a felon, the defendant could not legally purchase or possess any firearm, so, instead, the defendant recruited straw buyers to illegally buy them on his behalf. (PSR ¶¶ 3-4.) Once his straw purchasers obtained firearms, the defendant worked quickly to market them over Facebook and direct other co-conspirators in identifying additional customers. (PSR ¶ 8.) All told, law enforcement traced 34 firearms back to the defendant's conspiracy. (PSR ¶ 13.)

A. The Defendant's Use of Straw Buyers

Following the defendant's 2010 felony conviction for possessing an assault weapon and .380 caliber pistol, the defendant was prohibited from possessing any other firearm. In order to deliberately avoid gun safety laws that would have stopped the defendant's criminal scheme at the outset, the defendant found straw purchasers to secure his cache of weapons. These straw buyers included his co-defendants Anessa Christian and Brianna Glee. In the course of the investigation, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") identified 12 firearms that Christian purchased from federally licensed firearms dealers ("FFLs") in Virginia between April 2017 and March 2018. (PSR ¶¶ 4-5.) The defendant directed and supervised these straw buyers intensely. As surveillance footage from FFLs revealed, the defendant personally accompanied Christian for multiple gun sales, shadowing her as she illegally purchased the guns and falsely stated they were for her use not the defendant's. (PSR ¶ 5.) Reflecting how efficiently the defendant operated the conspiracy, within hours of Christian's purchase of firearms, the defendant would send images of the firearms over Facebook. (PSR ¶¶ 6-7.)

The defendant adapted the conspiracy when Christian was no longer able to purchase firearms following her arrest on an unrelated matter. (PSR ¶ 7.) The defendant continued the gun trafficking scheme unabated by enlisting another straw buyer, co-defendant Brianna Glee. (PSR ¶ 7.) Records of Brianna Glee's firearms purchases show that after Christian's arrest, the defendant <u>increased</u> his inventory of firearms. (PSR ¶ 7.) Indeed, within days of Christian's arrest and continuing through at least April 25, 2018, Glee purchased 27 firearms from FFLs throughout Virginia. For many of these purchases, as with Christian, the defendant directed and supervised his straw purchaser by personally visiting or calling the FFL prior to send Glee to purchase additional firearms at the FFL. (PSR ¶ 7.)

B. The Defendant's Sale of the Illegally Purchased Firearms

Once his straw buyers completed the initial step in the scheme, the defendant turned to Facebook and his other co-conspirators to traffic these illegal firearms on to purchasers. (PSR ¶ 8.) For example, in the March 12, 2018 the defendant had the following exchange over Facebook with his co-defendant Tyshon Stevens, discussing his inventory of firearms and the prices they were offered for sale:

2

DEFENDANT: 

DEFENDANT: 

DEFENDANT: 

STEVENS: Stop tht on here tho
DEFENDANT: No signal been trying to send
STEVENS: They want both 80's

3

|  |  |
|---|---|
| DEFENDANT: | 950 |

In this exchange, Stevens confirmed that one or more individuals wanted to purchase two .380 caliber pistols ("They want both 80's") and, in response, the defendant quoted a price of $950. (PSR ¶ 8.)

The defendant reached out to multiple other intermediaries to help him illegally sell his firearms in New York. In June 2017, the defendant contacted an individual ("Individual-1") over Facebook, sending Individual-1 images of an array of firearms, which included Glock manufactured pistols. The defendant contacted Individual-1 again on June 7, 2017 and emphasized the purported benefits of the Glock manufactured firearms the defendant was selling, telling Individual-1, "Glocks are for serious accurate no fingerprint love . . . [p]lastic frame means no prints." Individual-1 responded plainly: "That's for hits."

A week after that exchange with Individual-1, the defendant communicated with his co-defendant Latoya Jones over Facebook to arrange sales of other firearms to purchasers in New York. For example, on June 16, 2017, the defendant and Jones had the following exchange:

|  |  |
|---|---|
| JONES: | Can u send pics of what's available right now the dude bout to come talk to me he is by Yankee Stadium |
| JONES: | 5 mins away |
| DEFENDANT: |  |
| JONES: | Can u get the Draco's?? |
| JONES: | And what if they don't want the clips |
| JONES: | How much u want it for without the clips and do u have the small one that was on the phone??? |
|  | [FACEBOOK PHONE CALL] |
|  | [FACEBOOK PHONE CALL] |
| DEFENDANT: | Yooo |
| JONES: | Homie had to go and I left but he gave me his order via text |

4

       DEFENDANT:       With no bread fuck that

In this exchange, after Jones asked to see images of the defendant's current inventory ("pics of what's available right now") because she was meeting a prospective customer in New York ("the dude about to come talk to me" near "Yankee Stadium") the defendant sent an image of multiple firearms, annotated with a white circle around one firearm. Jones and the defendant then discussed additional firearms, referencing "Draco's"—a type of automatic weapon—and "clips"—a term for a magazine of ammunition. (PSR ¶ 8.)

      C.    <u>The Defendant's Scheme Continued On After His Arrest in Virginia</u>

On August 15, 2017, the defendant was arraigned in Newport News, Virginia on misdemeanor concealed weapon and drug charges. (PSR ¶ 10.) After being released on bond, and while his cases were pending, the defendant continued to arrange additional firearm sales with Tyshon Stevens over Facebook. For example, on October 29, 2017, they had the following exchange:

DEFENDANT:



| | |
|---|---|
| DEFENDANT: | Brand new see who got 6 |
| STEVENS: | Wat is it |
| DEFENDANT: | 38 or 357 |
| STEVENS: | Is it a 8 tho |
| STEVENS: | Ion kno bout 6 but I'll c wats gud |
| STEVENS: | Is it a 57 |
| STEVENS: | I cud get six for tht |

5

DEFENDANT: It's both I got those with it

DEFENDANT: 

DEFENDANT: 

DEFENDANT: 

DEFENDANT: Cellular lights and beam

STEVENS: Wat is it

DEFENDANT: 2 mags $700 brand new 380

STEVENS: Ight ima see

In that exchange, the defendant and Stevens were discussing a .38 or .357 caliber pistol that the defendant was offering to sell for $600. The defendant then sent Stevens three images of a .380 caliber Taurus manufactured pistol priced at $700, which he described as having a laser sighting beam attached.

    D.    The Defendant's Arrest

On June 6, 2018, law enforcement agents executed a search warrant at 1231 Hampton Avenue, Newport News, Virginia, which was the defendant's residence in Virginia. During the search, law enforcement agents seized, among other things, firearms boxes, records related to a firearms transaction between a third-party seller and his co-defendant Christian.

The defendant was arrested that day and in his post-arrest interview, the defendant made numerous false and misleading statements to the agents in an attempt to pass suspicion onto his co-conspirators and away from himself. In that interview, he denied being involved in any gun purchases or trafficking, claiming that co-defendant Anessa Christian and his family members had simply sent him photographs of firearms.

II. <u>Guidelines Calculation</u>

The parties agree with the following Guidelines calculation set forth in the PSR:

| | |
|---|---:|
| Base Offense Level (§ 2K2.1(a)(4)(B)) | 20 |
| Plus: Offense Involved Between 25 and 99 Firearms (§ 2K2.1(b)(1)(C)) | +6 |
| Plus: Defendant Engaged in Trafficking of Firearms (§ 2K2.1(b)(5)) | +4 |
| Plus: Aggravating Role (§ 3B1.1(a)) | <u>+4</u> |
| Less: Acceptance of Responsibility | -3 |
| Total: | <u>31</u> |

(PSR ¶¶ 22-33.) With a Criminal History Category of II, the defendant's resulting Guidelines range is 121 to 151 months. Given the applicable statutory maximum, the defendant's restricted Guidelines range is 60 months.

III. <u>Discussion</u>

A. <u>Legal Standard</u>

In <u>United States v. Booker</u>, 543 U.S. 220, 245 (2005), the Supreme Court held that the Guidelines are advisory and not mandatory. The Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but they may also tailor the sentence in light of other statutory concerns. <u>Booker</u>, 543 U.S. at 220; <u>see</u> 18 U.S.C. § 3553(a). Subsequent to <u>Booker</u>, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to consider them, along with the other factors listed in section 3553(a)." <u>United States v. Crosby</u>, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." <u>Id.</u> at 113.

The Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the sentencing court] may not presume that the Guidelines range is reasonable. [The sentencing court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

Section 3553(a) requires a court to consider a number of factors in imposing sentence, including the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation; and the need for the sentence to afford adequate deterrence to criminal conduct; to protect the public from further crimes or violation of the defendant; and to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner. The court must also consider the kinds of sentences available, the applicable sentencing guideline and pertinent policy statements, and the need to avoid unwarranted sentencing disparities. See 18 U.S.C. § 3553(a)(1)-(6).

B. Application

The Court should sentence the defendant to 60 months' imprisonment, given his leadership of a long running, and dangerous gun trafficking conspiracy. As set forth below, each relevant sentencing factor weighs in favor of such a sentence. The defendant asks the Court to vary from the restricted Guidelines range of 60 months, but his arguments not only ignore the seriousness of his conduct, they also ignore the substantial sentencing benefit he's already received: a maximum sentencing exposure that is only 50% of the applicable 121 to 151 month Guidelines range contemplated by the Sentencing Guidelines.

The defendant committed an extremely serious crime for the sole purpose of enriching himself. The defendant's gun trafficking conspiracy exploited weaknesses in our country's gun regulations, obtaining a cache of weapons from states with lax gun laws and sending those guns into New York. The seriousness of his conduct was multiplied by the people he was getting these guns for: felons and gang members. Indeed, one of these guns was seized from a convicted felon in this District, which evidences how the defendant's conduct directly increased the risk of gun violence in this city. (PSR ¶¶ 3-4.) Notably, the investigation uncovered more than 30 firearms the defendant obtained through his straw purchasers. These firearms, which the defendant is personally responsible for putting on the streets, will continue to pose grave risks to the public every day they are unaccounted for.

In asking for a lenient sentence, the defendant's sentencing submission and his letters of support highlight his business acumen and intelligence. However, those facts cut against his plea for leniency. As he highlights for the Court, the defendant served in the Navy,

learned accounting and had legitimate avenues to make a living. But instead of honing the skills he gained, the defendant made a deliberate choice to lead a gun trafficking scheme designed to put guns in the hands of criminals. The sentence to be imposed by the Court must account for the seriousness of this conduct and a sentence of 60 months—which is still substantially lower than the applicable Guidelines range—is necessary to accomplish that goal.

Contrary to the defendant's arguments, his history and characteristics do not warrant a sentence of less than 60 months. The defendant led this conspiracy after a prior conviction for illegally possessing weapons—an assault rifle and pistol—and he continued directing the scheme even after his Virginia arrest for additional gun and drug crimes committed <u>during</u> the conspiracy. Taken together, this history reflects a serious disrespect for the law, and a knowing refusal to confirm his conduct to the dictates of courts, society and the law.

In asking for leniency, the defendant's letter to the Court suggests that he intends to move to California and live on land he purchased. But the idyllic picture he describes for the Court is contradicted by the one he painted for others in the course of the conspiracy. Consider the following exchange over Facebook between the defendant and an unidentified woman ("UF-1"):

| | | |
|---|---|---|
| DEFENDANT: | | I bought sum land in cali I'm so excited |
| UF-1: | | U did |
| UF-1: | | U moving |
| DEFENDANT: | | 20 acres for now I am king |
| | * * * | |
| DEFENDANT: | | I got coke weed molly guns and taxes |
| DEFENDANT: | | What a life |
| UF-1: | | Wat lml |
| DEFENDANT: | | Maybe imma go be a farmer |
| UF-1: | | Lol |
| DEFENDANT: | | Fames need all that and some shrooms |
| DEFENDANT: | | Farmers* |

As he told UF-1 in this exchange, the defendant considered California an opportunity to continue the same life of crime he was living before his arrest in this case. His statements to co-defendant Jones are similarly at odds with what he tells the Court now:

| | | |
|---|---|---|
| DEFENDANT: | | Yeah I just took a major loss in cali I bought 5 plates 3 made it and 2 is trash |
| JONES: | | WTF |

9

| | |
|---|---|
| JONES: | Well we got work to do |
| DEFENDANT: | Fedex |
| DEFENDANT: | Definitely |
| JONES: | SMMFH Dem bitch ass niggas |
| DEFENDANT: | Word |
| JONES: | Wow |
| JONES: | That is fucked up |
| DEFENDANT: |  |
| | \*   \*   \* |
| DEFENDANT: | Really trying to get this Cali shit poppin like I'm looking to build me a lake for the fish |
| DEFENDANT: | Use the waste water to grow |
| DEFENDANT: | All natural |
| | \*   \*   \* |
| JONES: | So u will live out there? |
| | \*   \*   \* |
| DEFENDANT: | Can't stay gun laws would put me under the jail |

These messages show the defendant's true motivations and plans. More troublingly still, they reflect a desire to continue illegally possessing and trafficking firearms.

Finally, the defendant's attempt to use his family as a significant reason for the Court to impose a sentence of less than 60 months should be rejected. The defendant chose to lead this gun trafficking conspiracy and to subordinate the interests of the very family members on which he now relies for his argument. Indeed, as trash searches and search warrants executed at the defendant's home confirmed, the defendant operated the firearms trafficking

10

conspiracy from the very home he shared with his young son. This raises serious doubts about the sincerity of the defendant's arguments to the Court. But even if credited, the facts about the defendant's family are more than accounted for by the statutory maximum, which reduced the defendant's sentencing exposure by 60 months.

Accordingly, every sentencing factor weighs in favor of a substantial sentence. Given the restricted Guidelines range of 60 months, the Court should impose a sentence of 60 months.

IV. Conclusion

For the reasons set forth above, the Court should sentence the defendant to 60 months' imprisonment.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By: /s/Drew G. Rolle
Drew G. Rolle
Assistant U.S. Attorney
(718) 254-6783

cc: Elizabeth Macedonio, Esq. (Counsel to the defendant) (by ECF)
Ilana Haramati, Esq. (Counsel to the defendant) (by ECF)